UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SOARING HELMET
CORPORATION,

                    Plaintiff,

        v.

NANAL, INC.,

                    Defendant.

CASE NO. C09-0789JLR

ORDER ON MOTIONS

        Before the court is (1) Defendant Nanal, Inc. d/b/a Leatherup.com's ("Nanal")

motion for summary judgment (Dkt. # 57); (2) Nanal's motion to strike (Dkt. # 67); and

(3) Plaintiff Soaring Helmet Corporation's ("Soaring Helmet") motion for leave to file

third amended complaint (Dkt. # 74).  Having reviewed the papers filed in support of and

in opposition to the motions and no party having requested argument on the motions, the

court GRANTS in part and DENIES in part Nanal's motion for summary judgment (Dkt.

ORDER- 1

1  # 57); GRANTS in part and DENIES in part Nanal's motion to strike (Dkt. # 67); and

2  DENIES Soaring Helmet's motion for leave to file third amended complaint (Dkt. # 74).

3  ## I.   BACKGROUND

4  Soaring Helmet is a Washington company located in Kent, Washington.  (Demund

5  Decl. (Dkt. # 61) ¶ 2.)  It is a wholesaler of motorcycle helmets and accessories,

6  including a variety of motorcycle-related riding apparel and accessories, such as jackets,

7  vests, pants, boots, goggles, chest protectors, gear bags, and head raps.  (*Id.* ¶¶ 2-3.)

8  Soaring Helmet is the owner of the VEGA trademark, which was registered with the

9  United States Patent and Trademark Office ("PTO") on August 12, 1997, and was

10  assigned Registration Number 2,087,637 for "motorcycle helmets."  (*Id.* ¶ 4.)  From 1994

11  to the present, Soaring Helmet has owned and used continuously the VEGA trademark.

12  (*Id.*)  In addition to a trademark for "motorcycle helmets," Soaring Helmet also owns the

13  federally registered trademark VEGA TECHNICAL GEAR, Registration Number

14  3,639,490 for "motorcycle helmets and protective clothing."  (*Id.* ¶ 5.)

15  According to Soaring Helmet's Vice-President, Jeanne Demund, since adopting

16  the VEGA mark, the company has sold a wide and diverse variety of helmets and

17  technical gear to customers throughout the United States.  (*Id.* ¶ 6.)  It has invested

18  substantial sums of money, effort and time to use, advertise, promote and develop the

19  VEGA mark.  (*Id.*)  Soaring Helmet sells exclusively through authorized distributors of

20  its products.  Soaring Helmet requires the distributors to be legitimate, reputable retailers.

21  (*Id.* ¶ 7.)  In fact, Soaring Helmet requires that potential dealers provide to it copies of

22  their business licenses, sales tax permits, business telephone listing information, as well

1    as photos of their store interior and exterior.  (*Id.*)  As a matter of corporate policy,

2    Soaring Helmet also requires its dealers to sell VEGA products at no less than Soaring

3    Helmet's manufacturer's suggested retail price and will terminate dealers that violate this

4    policy.  (*Id.* ¶ 8, Ex. A ("Selling Policy".)

5         When the internet became a factor in sales, Soaring Helmet developed a policy

6    that included selling only through legitimate dealers, and not permitting internet-only

7    sales outlets as dealers.  (*Id.* ¶ 10.)  According to Ms. Demund, Soaring Helmet's brick-

8    and-mortar retailers are very sensitive to internet-only sales outlets, as there is a strong

9    sense among these retailers that selling through internet-only dealers diminishes and

10   taints the value of the product.  (*Id.*)  In part, this is due to internet discounting, which is a

11   "hot button" issue for Soaring Helmet's authorized dealers.  (*Id.* ¶ 13.)  Ms. Demund

12   declared that in her 16 years in the industry she has learned that the motorcycle industry

13   at the retail level is composed overwhelmingly of individually owned stores, or small

14   chains with few outlets, who perceive internet discounting as harmful to their interests.

15   (*Id.* ("They watch carefully for unfair discounting, and brands that allow this are quickly

16   tainted.").)

17        Nanal is a Nevada company formed in 2005 to own and operate a website called

18   "LeatherUp.com", which promotes and sells motorcycle apparel (such as leather and

19   mesh jackets, boots, helmets, and vests) and motorcycle parts.  (Bootesaz Decl. (Dkt.

20   #58) ¶ 3.)  Nanal is an internet-only company; all of its sales are made through its

21   website.  (*Id.*)  On or about September 1, 2008, Nanal bought the keywords "vega

22   helmets" through Google AdWords.  (Bootesaz Decl. ¶ 4.)  Albert Bootesaz, president of

1   Nanal, testified that the keywords were suggested by Google after he entered "helmets"

2   as a search term.  (*Id.*)  At the time that he bought the keywords "vega helmets" he

3   thought that it referred to a solar system or a star.  (*Id.*)  Nanal ceased using the keywords

4   "vega helmets" in April 2009 after receiving a cease and desist letter from Soaring

5   Helmet's counsel.  (*Id.* ¶ 5.)  Nanal also took the additional step of incorporating a

6   negative instruction to Nanal's Google AdWords campaign so that LeatherUp.com's

7   advertisements do not appear when the word "Vega" is searched.  (*Id.*)  Mr. Bootesaz

8   also testified that the word "Vega" has never been used on the LeatherUp.com website

9   and he has never directed that the word be incorporated into the website in any manner.

10  (*Id.* ¶ 8.)

11          Contrary to Mr. Bootesaz representation, Ms. Demund provides evidence showing

12  that the LeatherUp.com website advertised the "XElement Vega Leather Jacket," which

13  was neither manufactured nor licensed by Soaring Helmet.  (Demund Decl. ¶ 21.)  As of

14  November 22, 2010, Ms. Demund testified that the XElement Vega Leather Jacket was

15  still being offered for sale on eBay.com and Cobragear.com.  (*Id.* ¶ 23.)

16          On June 9, 2009, Soaring Helmet filed suit against the owner of the

17  LeatherUp.com website.[1]  Soaring Helmet alleges that Nanal's use of the keywords "vega

18  helmets" in connection with Nanal's marketing, advertising, and sale of motorcycle

19  jackets has and is likely to deceive customers or prospective customers of Soaring

20  _____

21      [1]  Soaring Helmet initially named the wrong defendant, Bill Me, Inc., because the
    LeatherUp.com website stated in its terms and conditions that Bill Me, Inc. owned
22  LeatherUp.com.  (Morado Decl., Ex. G.)

1   Helmet and constitutes trademark infringement in violation of 15 U.S.C. § 1114.  (Sec.

2   Am. Compl. (Dkt. # 48) ¶¶ 5.1-5.14.)  Soaring Helmet also asserts claims against Nanal

3   for false designation of origin, false advertising, and unfair competition pursuant to 15

4   U.S.C. § 1125(a).  (*Id.* ¶¶ 6.1-6.9.)  Finally, Soaring Helmet asserts two state-law claims

5   against Nanal: violation of the Washington State Unfair Business Practices and

6   Consumer Protection Act ("CPA"), RCW 19.86, and tortious interference with

7   prospective economic advantage.  (*Id.* ¶ 7.1-8.6.)  Nanal moves for summary judgment on

8   all of the claims asserted against it.  The court addresses each in turn below.

9                              **II.    ANALYSIS**

10         Before addressing the merits of Nanal's motion for summary judgment, the court

11  must determine whether portions of Soaring Helmet's evidence was disclosed after the

12  discovery deadline and whether Soaring Helmet should be permitted to amend its

13  complaint for a third time to assert personal claims against Nanal's president, Mr.

14  Bootesaz.

15  **A.    Motion to Strike**

16         Nanal moves to strike the following evidence on the basis that it was untimely

17  disclosed by Soaring Helmet: (1) exhibit N to the Morado Declaration found at docket

18  number 66; (2) exhibits A, B and C to the Mallard Declaration found at docket number

19  64 and paragraphs 10-14 and 16-20; (3) paragraphs 4-11 of the Loga Declaration found at

20  docket number 63; (4) paragraphs 8-14 of the Layman Declaration found at docket

21  number 62; and (5) paragraphs 20-22 of the DeMund Declaration found at docket number

22

1  61.  (Reply (Dkt. # 67) at 1-2.)  Nanal requests that this material be stricken pursuant to

2  Rule 37 of the Federal Rules of Civil Procedure.

3      Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a

4  witness as required by Rule 26(a) and (e), the party is not allowed to use that information

5  or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure

6  was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Here, Nanal moves

7  to strike testimony from Claudia Mallard, Wayne Layman, and Jeanne Demund, all of

8  whom were disclosed by Soaring Helmet in August 17, 2009, but Nanal chose not to

9  depose.  (Morado Decl. (Dkt. # 81) at Ex. A.)  Similarly, Joy Loga was identified in

10  Soaring Helmet's answer to Nanal's interrogatory request on June 21, 2010.  (*Id.*, Ex. C.)

11  Accordingly, because Rule 26(a) requires Soaring Helmet to disclose only the name of its

12  potential witnesses and the subject of their testimony, and Nanal chose not to depose any

13  of Soaring Helmet's witnesses, Nanal cannot now complain that there are areas of these

14  witnesses' testimony for which it was not aware.  The court therefore denies Nanal's

15  motion to strike the testimony of witnesses previously disclosed by Soaring Helmet.

16      As for the exhibits attached to the declaration of Claudia Mallard, the court finds

17  that Soaring Helmet's failure to disclose them prior to the discovery deadline was

18  prejudicial to Nanal.  *See* Fed. R. Civ. P. 37(c)(1).  Ms. Mallard is a sales representative

19  for Vega Helmets.  (Mallard Decl. ¶ 2.)  Her declaration includes notes from meetings

20  with prospective clients that she relied on in providing her testimony and a copy of a

21  business card from a Jim Machnik, a customer that complained about the Nanal website.

22  (*Id.*, Exs. A-C.)  Discovery closed in this case on September 20, 2010 but it appears that

1   Soaring Helmet waited until November 19, 2010 to gather evidence from Ms. Mallard.

2   While it is appropriate to provide declarations of witnesses setting forth their trial

3   testimony in opposing a motion for summary judgment, offering new evidence not

4   previously disclosed violates Rule 37.  The court strikes the untimely filed exhibits

5   attached to the Mallard Declaration.

6          Finally, Nanal complains that exhibit N to the Morado Declaration was not

7   previously disclosed and should therefore be stricken.  (Reply at 7.)  Exhibit N is a 30-

8   page spreadsheet setting forth the Soaring Helmet's national sales for 2009.  (Morado

9   Decl., Ex. N.)  Soaring Helmet does not dispute that exhibit N had not previously been

10  disclosed and contends that it mistakenly attached the wrong spreadsheet to the Morado

11  declaration.  (Resp. (Dkt. # 80) at 5.)  Since Soaring Helmet has already corrected the

12  error by filing a new exhibit N, the court denies Nanal's motion with respect to this

13  exhibit as moot.

14  **B.     Motion for Leave to Amend**

15         Soaring Helmet moves to amend its complaint to add a new defendant less than

16  two months before trial.  Soaring Helmet argues that it should be permitted to add the

17  president of Nanal, Albert Bootesaz, because it has learned that he exercises "total

18  control" over Nanal's activities.  (Mot. (Dkt. # 74) at 1-2.)  In arguing for leave to amend

19  its complaint, it focuses on the liberal amendment policy of Federal Rule of Civil

20  Procedure 15(a)(2).  However, Rule 15(a)(2) is not the only standard that applies here.

21  Instead, a party's ability to amend a pleading after the scheduling order deadline is

22  governed by Rule 16(b).  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th

ORDER- 7

1    Cir. 1992) ("The scheduling order controls the subsequent course of the action unless

2    modified by the court.") (internal quotations omitted).  A party seeking modification of

3    the scheduling order must demonstrate good cause.  *Id.*  Specifically, a plaintiff seeking

4    to amend its complaint after the scheduling order deadline "must first show 'good cause'

5    for amendment under Rule 16(b), then, if 'good cause' be shown, the party must

6    demonstrate that amendment was proper under Rule 15."  *Id.* (citing *Forstmann v. Culp*,

7    114 F.R.D. 83, 85 (M.D.N.C. 1987)).

8           The "good cause" inquiry under Rule 16(b) "primarily considers the diligence of

9    the party seeking the amendment."  *Johnson*, 975 F.2d at 609.  "Although the existence

10   or degree of prejudice to the party opposing the modification might supply additional

11   reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for

12   seeking modification."  *Id.* (citing *Gestetner Corp. v. Case Equipment. Co.*, 108 F.R.D.

13   138, 141 (D.Me. 1985).  "If that party was not diligent, the inquiry should end."  *Id.*

14   Soaring Helmet argues that it was diligent in moving to amend the complaint because it

15   "only learned of Mr. Bootesaz's controlling participation in the actions of [Nanal] when it

16   took his deposition on September 20, 2010."  (Mot. at 3.)  First, the court points out that

17   Soaring Helmet learned this in September but did not move to amend for another two

18   months, after Nanal filed its motion for summary judgment and after discovery had

19   closed in this case.  Second, the court is not persuaded that Soaring Helmet "only

20   learned" of Mr. Bootesaz's controlling participation in Nanal at his September

21   deposition.  Mr. Bootesaz filed his first declaration in this case in October 2009, wherein

22   he declared that he was the president of Nanal.  (Lay Decl. (Dkt. # 78) Ex. 2.)  Mr.

1   Bootesaz was identified as the president of Nanal in numerous pleadings since October

2   2009. (*See* Lay Decl., Ex. 4 (pleading served in January 2010 stating that Mr. Bootesaz

3   had knowledge of Nanal's business, operations, products and marketing, including

4   information relating to interest search engines, namely Google, and Nanal's use of the

5   Adword program); Ex. 6 (pleading served in July 2010 stating that Mr. Bootesaz was

6   president of Nanal and the person responsible for selecting the Google Adwords).

7   Because Soaring Helmet did not act diligently in moving to amend its complaint, nor did

8   it act diligently in pursuing a piercing the corporate veil theory, the court denies its

9   motion to amend its complaint. This matter is set for trial in under a month. The court

10  cannot excuse Soaring Helmet's delay and permit it to name Mr. Bootesaz at this late

11  stage in the proceedings. Because the court does not find good cause pursuant to Rule

12  16(b), it need not address the lesser standard set forth in Rule 15.

13  **C.   Motion for Summary Judgment**

14          Nanal moves for summary judgment on all of Soaring Helmet's claims against it.

15  Summary judgment is appropriate if the evidence, when viewed in the light most

16  favorable to the non-moving party, demonstrates there is no genuine dispute of material

17  fact. Fed. R. Civ. P. 56(a);[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

18  *County of Los Angeles,* 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the

19

20          [2] Rule 56 has been amended, effective December 1, 2010. The substantive standard for
21  summary judgment remains unchanged, however. *See* Fed. R. Civ. P. 56 advisory committee's
    note. Nevertheless, as this motion was filed before the amendment went into effect, the prior
22  version of the rule governs the court's analysis.

1    initial burden of showing there is no material factual dispute and he or she is entitled to

2    prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets its

3    burden, the nonmoving party must go beyond the pleadings and identify facts which

4    show a genuine dispute for trial.  *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200

5    F.3d 1223, 1229 (9th Cir. 2000).

6         1.  <u>Lanham Act Claims</u>

7         Nanal argues that Soaring Helmet cannot show that there is a likelihood of

8    confusion to support a claim for either trademark infringement, 15 U.S.C. § 1114, or false

9    designation of origin and unfair competition, 15 U.S.C. § 1125(a).  The court begins its

10   analysis with the Ninth Circuit's teachings that trademark disputes are "intensely factual

11   in nature" and summary judgments are generally disfavored in the trademark context.

12   *Interstellar Starship Serv., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999).

13        The test for likelihood of confusion is whether a "reasonably prudent consumer" in

14   the marketplace is likely to be confused as to the origin of the good or service bearing

15   one of the marks.  *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127,

16   1129 (9th Cir. 1998) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.

17   1979) (setting out the *Sleekcraft* factors)).  The *Sleekcraft* factors include: (1) strength of

18   the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and

19   meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and

20   purchaser care; (7) intent; and (8) likelihood of expansion.  (*Id.*)  The factors should not

21   be rigidly weighed; we do not count beans.  *Dreamwerks*, 142 F.3d at 1129.  "Rather, the

22   factors are intended to guide the court in assessing the basic question of likelihood of

ORDER- 10

1  confusion." *Id.* (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293

2  (9th Cir. 1992)).

3        Here, the court finds that an analysis of the *Sleekcraft* factors as applied to the

4  facts in this case supports a finding that there is a genuine dispute as to the likelihood of

5  confusion, such that the dispute should be presented to the jury.  To begin, Soaring

6  Helmet's trademark "vega" is an arbitrary term as it relates to motorcycle helmets

7  thereby making it a relatively strong mark.  *See Brookfield Comm., Inc. v. W. Coast*

8  *Entm't Corp.*, 174 F.3d 1036, 1037 (9th Cir. 1999) (discussing the greater strength of

9  arbitrary marks because they are more likely to be remembered and associated in the

10  public mind with the mark's owner).  Thus, the first factor is met.  The majority of the

11  remaining *Sleekcraft* factors also support a finding that a consumer would be confused by

12  Nanal's use of the term "vega helmets" in its advertisements.  For example, the proximity

13  or relatedness of the goods is the same, i.e., motorcycle gear and accessories, there is also

14  similarity of sight, sound and meaning as Nanal advertised "vega helmets" and Soaring

15  Helmet has a registered trademark cover the use of "vega" for motorcycle helmets.

16  Finally, Nanal admits that there is evidence of actual confusion in the same market

17  channels because a number of consumers who were diverted to Nanal's website after

18  searching for vega helmets actually clicked through to LeatherUp.com's website and

19  purchased product from Nanal.  (Bootesaz Decl. ¶ 6.)

20        Because evidence on the record would permit a rational factfinder to find a

21  likelihood of confusion, the court denies Nanal's motion for summary judgment as to the

22  trademark infringement and unfair competition claims.

ORDER- 11

1    2.  <u>False Advertising</u>

2    Nanal argues that Soaring Helmet's claim for false advertisement under the

3  Lanham Act should be dismissed because there is a "dearth of evidentiary support."

4  (Mot. at 15.)  The elements of a Lanham Act § 43(a)[3] false advertising claim are: (1) a

5  false statement of fact by the defendant in a commercial advertisement about its own or

6  another's product; (2) the statement actually deceived or has the tendency to deceive a

7  substantial segment of its audience; (3) the deception is material, in that it is likely to

8  influence the purchasing decision; (4) the defendant caused its false statement to enter

9  interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of

10  the false statement, either by direct diversion of sales from itself to defendant or by a

11  lessening of the goodwill associated with its products.  *Southland Sod Farms v. Stover*

12  *Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citing *Cook, Perkiss and Liehe, Inc. v.*

13  *Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)).

14    Nanal focuses its argument on elements three and five – material deception and

15  injury, respectively.  Soaring Helmet correctly points out, however, that a finding that the

16  advertisement was literally or facially false leads to a presumption of consumer deception

17  and materiality in a false advertisement case.  *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793

18  F.2d 1034, 1040-41 (9th Cir. 1986); *Southland Sod*, 108 F.3d at 1146.  Here, there is

19

20    [3] Lanham Act § 43(a), codified at 15 U.S.C. § 1125(a), provides in pertinent part: "(1)
Any person who, on or in connection with any goods or services, or any container for goods,

21  uses in commerce any . . . false or misleading representation of fact, which . . . (B) in commercial
advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin

22  of his or her or another person's goods, services, or commercial activities, shall be liable in a
civil action by any person who believes that he or she is or is likely to be damaged by such act."

ORDER- 12

1   sufficient evidence to demonstrate falsity within the meaning of the Lanham Act.

2   Nanal's president admitted both that he used "vega helmets" as an Adword through

3   Google and that his company was not authorized to, nor did it, sell vega helmets.

4   (Bootesaz Decl. ¶ 6; Demund Decl. ¶ 14.)  The falsity of Nanal's advertisement creates a

5   presumption of deception and reliance.  *See, e.g., Abbot Labs v. Mead Johnson & Co.*,

6   971 F.2d 6, 17 (7th Cir. 1992).

7          As for injury, the court is satisfied that Soaring Helmet has come forth with

8   evidence of actual injury.  For example, Soaring Helmet produced evidence that dealers

9   hesitated to do business with it after viewing the Nanal advertisement stating that it sold

10  vega helmets at 50% off the suggested manufacturer's price.  (Mallard Decl. ¶ 14; Loga

11  Decl. ¶¶ 3-8; Layman Decl. ¶ 12.)  Soaring Helmet also produced evidence of the amount

12  of money it spends on advertising and marketing its product, as well as its strict policies

13  on who is eligible to be an authorized dealer and at what price its Vega products may be

14  sold by those dealers.  (Demund Decl. ¶¶ 8-15, 24.)  According to Soaring Helmet,

15  Nanal's conduct in falsely advertising vega helmets and jackets at "50% off" seriously

16  diluted Soaring Helmet's mark and damaged its relationship with its dealers.

17  Accordingly, the court is satisfied that, at a minimum, Soaring Helmet has produced

18  sufficient evidence that it has suffered damages to its business, goodwill, reputation and,

19  possibly, its profits.  *See* 15 U.S.C. 1117(a).

20         3.  State-Law Claims

21         In addition to its Lanham Act claims, Soaring Helmet also asserts two state-law

22  claims: CPA and tortious interference.  The Washington CPA makes unlawful "[u]nfair

1   methods of competition and unfair or deceptive acts or practices in the conduct of any

2   trade or commerce . . . ."  RCW 19.86.020 (2009).  Under the CPA, a plaintiff must

3   demonstrate (1) an unfair or deceptive act or practice (2) occurring in trade or commerce

4   (3) that impacts the public interest (4) causing an injury to the plaintiff's business or

5   property with (5) a causal link between the unfair or deceptive act and the injury suffered.

6   *Dewitt Const. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1132 (9th Cir. 2002).

7   The parties agree that Soaring Helmet's claims under the CPA rise or fall with the

8   Lanham Act trademark infringement and unfair competition claims.  Accordingly,

9   because the court finds there is sufficient evidence to support the Lanham Act claims it

10   similarly finds that Soaring Helmets CPA claim survives summary judgment.

11          As for Soaring Helmet's tortious interference claim, Nanal moves to dismiss it on

12   the basis that Soaring Helmet failed to show that there was any termination of a business

13   expectancy that resulted in damage to it.  Under Washington law, there are five elements

14   to a tortious interference with business expectancy claim: (1) the existence of a valid

15   contractual relationship or business expectancy; (2) that defendants had knowledge of

16   that relationship; (3) an intentional interference inducing or causing a breach or

17   termination of the relationship or expectancy; (4) that defendants interfered for an

18   improper purpose or used improper means; and (5) resultant damage."  *Leingang v.*

19   *Pierce Cnty Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).  All the essential

20   elements must be established to support a claim of tortious interference.  *Young v. Key*

21   *Pharms., Inc.*, 770 P.2d 182, 188 (Wash. 1989).

22

ORDER- 14

1    Soaring Helmet fails to produce evidence that there was an existing business

2  expectancy that it lost as a result of Nanal's conduct.  Instead, Soaring Helmet argues

3  generally that it had a reasonable and valid expectation that "potential customers

4  searching for Soaring Helmet's VEGA trademark would not be lured to a website that

5  does not in fact sell any of Soaring Helmet's products."  (Mot. at 22.)  Soaring Helmet

6  does not identify any lost business expectancy to support this argument.  General

7  allegations of lost business do not create a question of fact for trial.  The court therefore

8  grants summary judgment in favor of Nanal on this claim.

9                           **III.    CONCLUSION**

10    For the above reasons, the court GRANTS in part and DENIES in part Nanal's

11  motion for summary judgment (Dkt. # 57); GRANTS in part and DENIES in part Nanal's

12  motion to strike (Dkt. # 67); and DENIES Soaring Helmet's motion for leave to file third

13  amended complaint (Dkt. # 74).

14    Dated this 3rd day of January, 2011.

15

16

17    _____

18    JAMES L. ROBART
      United States District Judge

19

20

21

22

ORDER- 15